COFFMAN *v.* KEIGHTLEY, Auditor of *Putnam* county, and Another. *

BOUNTIES TO VOLUNTEERS.—The act of *March* 3, 1865, which legalizes the appropriations made by county boards and municipal authorities for bounties to volunteers, is not in conflict with the law or the authority of the *United States,* and is valid.

TITLES OF LAWS.—The title of the act of *March* 3, *supra,* while not the most appropriate, is not so defective as to render the law unconstitutional.

APPEAL from the *Putnam* Circuit Court.

GREGORY, J.—*Coffman,* a tax payer of *Putnam* county, filed his complaint against the *Board of Commissioners,* the *Auditor,* and his deputy, praying for an injunction, restraining the defendants from issuing or circulating certain county orders, and from assessing a tax or appropriating money for the payment thereof. A demurrer was sustained to the complaint, which presents the question for consideration.

On the 6th of *January,* 1865, the *Board of Commissioners* of *Putnam* county made an order, directing the auditor to issue county orders for two hundred dollars each, payable the 1st of *April,* 1866, with interest, and also county orders for two hundred dollars each, payable the 1st of *April,* 1867, with interest. Five hundred of each class were to be issued and placed in the hands of *William D. Allen, James G. Edwards* and *A. H. Gilmore,* who were appointed recruiting agents of the county, and who were directed to proceed to obtain recruits for the *United States* service, to be credited to the county, and as fast as they obtained them, and had them mustered into service, they were to deliver to each of them two of the county orders, one of each class. The recruits were to be credited to each of the townships, in the proportion of their several quotas. On the 3d of *February* following, the commissioners modified

* This and the following case were decided at the *November* Term, 1865, and are published here to meet a general desire of the bar.

this order, by directing the issue of the county orders in question to each township, equal in number to their several quotas under the last call of the President of the *United States* for troops. Under this modified order, recruiting officers were appointed for each township, who were to receive a compensation for each recruit.

The validity of these orders is the turning point of the case in judgment.

On the 11th of *May*, 1861, the legislature passed an act in which it is provided, "that the boards of commissioners of the several counties of the state, and the incorporated cities and towns of this state be, and they are hereby, authorized to appropriate out of their respective county, city or town treasuries, such sums of money as they may deem proper, for the protection and maintenance of the families of volunteers in the army of the *United States*, and of the state of *Indiana*, during their continuance in such armies, and to make such appropriations for the purchase of arms and equipments, for the raising and maintaining of military companies within their respective jurisdictions, either for home defense, or for the service of this state or the *United States*, and such other necessary expenditures for the defense of their respective counties, cities and towns as the exigencies of the times may, in their judgment, demand. And the county boards and the authorities of the incorporated towns and cities are hereby empowered to make such regulations as they may think right and proper, in the disbursement of said appropriations." Acts of the special session 1861, § 1, p. 22.

Exigencies arose during the late rebellion unlooked for at the passage of this act. It was the settled policy of *Indiana* to promptly respond to every call made upon her for troops, to serve in the national army in defense of our common country. And while thousands of brave men were ready to volunteer, the body of those who remained at home were ever ready to share the burden. At each successive call of the President for troops, in response to the

Coffman *v.* Keightley, Auditor of Putnam County, and Another.

urgent desire of the people, our several boards of commissioners, city councils, and other local authorities made, from time to time, appropriations for the support of soldiers' families, and provided for local bounties to volunteers and drafted men. The moving cause for many of these provisions for local bounties, doubtless, was a desire to relieve their several localities from pending drafts. It was found that in a large majority, perhaps, of the cases, the local authorities had transcended the power conferred on them by the act of 1861, and in compliance with what seemed, at the time, to be an almost universal wish, the legislature passed the act of *March* 3d, 1865, in which it is provided, "that all bonds or orders heretofore issued, or appropriations made, by and under the authority of the boards of commissioners of the several counties of this state, and the incorporated cities and towns thereof, for the purpose of procuring or furnishing volunteers and drafted men for the army or navy of the *United States,* or for maintaining the families of volunteers, soldiers, substitutes or drafted men, or otherwise to aid the government in suppressing the rebellion, be and the same are hereby ratified, affirmed and legalized." Acts of 1865, § 1, p. 126.

It is urged that the war power is exclusively in Congress, and that it is not competent for the state legislatures to authorize the giving of local bounties to induce volunteering, in filling up the army or navy of the national government. This can hardly be considered an open question. The Supreme Court of *Connecticut,* in the case of *Booth et al.,* v. *The Town of Woodbury,* 27 Law Reporter, 232, held valid an appropriation by the town of *Woodbury,* under the sanction of an act of the legislature of that state, of six thousand dollars, to be divided among the men who should be drafted to fill the quota of that town, authorized by a law of the *United States,* and called for by the President, and for the purpose of assisting the citizens so drafted to obtain substitutes, or as a bounty, if they personally answered the draft and served.

The Supreme Court of *Pennsylvania*, in the case of *Speer et al.* v. *The School Directors and Burgess and Council of Blairsville*, 4 American Law Register, 661, held that the payment of bounties to volunteers, to enable a borough to furnish its military quota under an impending, and, as yet, unexecuted draft, is a payment for a public or municipal purpose; and a law authorizing a borough or other municipality to raise money for this purpose, by borrowing and taxation, is therefore constitutional.

The same thing was recognized by the Supreme Court of *Massachusetts*, in the case of *Fowler et al..* v. *Selectmen & Treasurer of Danvers*, 8 Allen, 80.

Justice AGNEW, in the *Pennsylvania* case, fully meets and answers the constitutional objection urged in argument in the case in judgment. He says: "There is nothing, in my judgment, in the argument founded upon the alleged repugnance of the law to the federal power to raise and support armies. There is no conflict of jurisdiction or of power. Admitting, to the fullest extent, the incompatibility of any state law assuming to regulate or to interfere with the raising and supporting of a federal army, there is here no interference, no regulation, and no repugnance. Congress purposely refrained from occupying the whole field of power, and expressly provided for the acceptance of volunteers in discharge of the draft. The act of *February* 24th, 1864, after providing for the distribution of military service by quotas, among the municipalities of each state, declared that "all volunteers who may enlist after the draft shall be ordered, and before it shall actually be made, shall be deducted from the number ordered to be drafted in such ward, town or township, precinct, election district, or county." This portion of the field, as to procuring volunteers, was therefore left open to the exercise of any means to induce persons to enlist in relief of the municipality from the pending, but as yet unexecuted draft. That this was intentional is recognized by the terms of the law. The third proviso of the seventh section, which provides for transfers into the

naval service, declares that the bounty money received from the state, by any mariner or seaman enlisting from that state, shall be deducted from his prize money. The proviso in the twentieth section, authorizing the discharge of minors entering the service without the consent of their parents or guardians, expressly requires such person, their parents or guardians, first to repay to the government, and *to the state and local authorities, all bounties* and advance pay which may have been paid to them. The federal law, therefore, does not assume to control or direct the procuring of volunteers. It simply suffers or permits the citizen to come forward voluntarily, and accept the service of the men to be drafted, and contemplates that inducements, in the shape of bounties, will be held out to volunteers by the states and municipalities from which they come."

The argument, therefore, that the act of *March* 3d, *supra,* so far as the same legalizes the payment of bounties to *volunteers,* comes in conflict with the federal law for drafting men into the service has no foundation. There is not a single point of conflict. The bounty operates only upon the will of the citizen to induce him to volunteer, and ends with his acceptance into service. It does not even undertake to determine his fitness to serve, but leaves this to the operation of the federal law.

We have been referred to the case of *Prigg* v. *The Commonwealth of Pennsylvania,* 16 Peters, S. C. Rep. 622. The ruling in that case was dissented from by Taney, C. J., and by Thompson and Daniels, J. J., was pronounced in *Weaver* v. *Fegely,* 5 Casey, 29, "a most mischievous heresy," and doubted if not overruled in *Moore* v. *The State of Illinois,* 14 Howard S. C. Rep., 13. The decision in *Prigg's* case had its origin in American slavery, so potent in shaping our legislation, and too often finding its way into the more sacred precincts of justice.

Some objection has been urged to the title of the act of *March* 3. It has been said that it is in conflict with section 19, article 4, of the constitution of this state, requiring that

"every act shall embrace but one subject, and matters connected therewith, which subject shall be expressed in the title." The title of the act in question is not a very apt one, but "the question whether a law be void for its repugnancy to the constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such, that the judge feels a clear and strong conviction of their incompatibility with each other." Per MARSHALL, C. J., in *Fletcher* v. *Peck*, 6 Cranch, 87; 2 Curtis, 328.

We think the Circuit Court committed no error in sustaining the demurrer to the complaint. The judgment is affirmed with costs.

*Williamson & Daggy,* for appellant.

*J. A. Matson,* for appellees.