NORTHERN PACIFIC RAILROAD, appellant, *v.* W. W. CARLAND, TREASURER, respondent.

PRACTICE.— Territorial district courts, sitting to hear and determine causes arising under the constitution and laws of the United States, have the same jurisdiction as United States circuit and district courts. An action brought to determine a controversy arising under an act of congress, involving the existence, effect and operation of such act, and especially when brought against a corporation chartered by act of congress, is properly brought in such court.

*What is properly included in right of way, and with it exempt from taxation.*— The right of way of a railroad chartered by act of congress through the public lands is an easement therein, and personal property attached to the soil, within the boundaries of such right of way, become part of the land, and are included in the exemption from taxation granted thereto, and any tax levied upon any part of the property so exempt is void.

*Power of congress in making grants — Reservations and restrictions — Vested rights under contract — Fourteenth amendment — Its limitations apply only to states.*— Congress has power to charter railroads, make grants of land to them, and exempt their right of way from taxation. The government may dispose of its own property on such terms and conditions as it sees fit, and congress is the sole judge thereof. The charter of such railroads is a contract, and the grant is for a consideration, and rights that become vested thereunder cannot be invalidated by legislative action. The fourteenth amendment is a limitation upon the power of the states, in the matter of taxation among other things, but it is not a limitation upon the power of congress in disposing of the property of the United States.

*Assessment, to be valid, must comply with the statute.*— An assessment must be made in substantial compliance with law to be valid.

Under the statutes of Montana, real and personal property must be listed and valued separately so that the county commissioners may act as a board of equalization thereon. A demand must also be made of the proper officer to render a list of property under oath.

*When equity will interpose to prevent collection of a tax.*— Equity will interpose to prevent the collection of an illegal tax, when it would cast a cloud upon the title; and a tax regular upon its face creates a lien upon real estate against which it is assessed, and is a cloud upon the title, and a tax deed, by law made *prima facie* evidence of title, would also cloud a title. Not so, if the tax is illegal on its face. Equity will interfere to prevent the collection of a tax upon property exempt from taxation; to prevent a multiplicity of suits; to prevent the destruction of a franchise; to protect the quiet enjoyment of an easement; and to protect rights, the evidence of which is liable to be lost.

*Appeal from Gallatin County, First Judicial District.*

SANDERS & CULLEN and TOOLE & TOOLE, for appellants.

I. This is an action brought to enjoin the defendant from collecting taxes on the " railroad " of the plaintiff, it claiming immunity from such tax by virtue of section 2 of its act of incorporation (13 U. S. Stat. at Large, p. 365), which defines the " right of way to be " two hundred feet in width on "each side of said railroad where it may pass through the public domain, including all necessary ground for station buildings, work-shops, depots, machine-shops, switches, side tracks, turn-tables and water stations," and which provides that " the right of way shall be exempt from taxation within the territories of the United States."

II. Two questions are to be considered:

(*a*) Is the company entitled to immunity from taxation on its roads; and

(*b*) Are the facts set forth such as entitle it to the injunction?

Of these in their order let us consider.

It does not need to be argued that the charter is a contract between the United States and the company; that the privileges it secures are inviolable, and that whatever exemptions from taxation are granted remain in full

force. *Piqua Bank* v. *Knox*, 16 How. 269; *Dodge* v. *Woderly*, 18 How. 331; *Humphreys* v. *Pegues*, 16 Wall. 244.

And I. Other transcontinental railroads had large grants of United States bonds, but this, in lieu of those, was given exemption from taxation within the territories. The phrase used is, "said right of way." This " way " is defined to be a strip of land four hundred feet wide, including other lands along and adjoining this strip, for the certain purposes designated in the charter.

II. It has been suggested that this phrase, "right of way," does not mean the land described as a "way " and as a "right of way," but was designed to include only an intangible privilege, neither on the earth nor in the air — an abstraction incapable of comprehension or definition. This ideal property, only grappled by the metaphysician, is incapable of valuation, seizure or sale, and so to define this part of legislation would be to attribute to the congress absurdities which, in this act, it has said nothing to deserve.

III. Said " way," which is exempt by express definition, includes "all necessary ground " for railroad purposes, and consistency of interpretation requires the court to say that this strip of land from Lake Superior to Puget Sound, where it runs through the territories, is, with the additional ground for the purposes designated, exempt from taxation. We therefore conclude that the phrase "right of way" means "land," and the entire interest in land of the plaintiff in this action.

IV. There are those who concede that this strip of land is exempt from taxation, and, grudgingly yielding this, say that the superstructures thereon, consisting of ties, track, switches, houses, water tanks, etc., may be taxed. The phrases "way " and "right of way" used by congress must be interpreted in the sense in which congress used them, it being as much without the authority of the territorial legislature to qualify them as it is to repeal

the law.   Indeed, if the local legislature could qualify
the meaning of those phrases it would be *pro tanto* a
repeal.   Having already seen that these phrases mean
"land" and all the interest therein which the plaintiff
owns, we are led along by easy stages to consider what is
"land."

Light may be thrown on this by considering the inter-
pretation given to the statute exempting from sale
"homesteads."     Doubtless, the word "homestead"
could be refined by the hypercritical out of any tangible
meaning, and could be as plausibly sublimated and emas- ·
culated as could the words "way" or "right of way."
And yet it has not been suggested by any lawyer of so·
briety and character that the houses, fences, trees, wells
and other things on the homestead which partake of the
realty could be sold on execution, and leave to the un-
lucky homesteader that which the government secured
him by exempting his homestead from sale on execution.
Such a discovery would aid many creditors in the coun-
try, and would make a mockery of the boon of exemp-
tion, which it is even yet supposed is thrown around the
owner of a homestead.

When the congress exempted this land from taxation
they meant to include whatsoever is known generically as
"land."   In this sense, houses are "land;" water is
"land;" ties and rails, or a railroad bed, are "lands."
See 128 Mass. ——; *Teaff* v. *Ross*, 1 Ohio St. 469;
*McRea* v. *Cent. Nat. Bank*, 66 N. Y. 489–505; *Murdock*
v. *Gifford*, 18 N. Y. 28.

The maxim *Quicquid plantatur solo, solo cedit* is of
great antiquity, and is adhered to in the latest authorities.
The ingenuity of lawyers has been severely taxed in the
interest of tenants as against landlords; mortgagors
against mortgagees; tenants as against reversioners or
remainder-men, as well as in favor of the executor and
against the heir, and in favor of supposed interests of
trade or manufactures to modify the rule, and in these

interests only has the severity of the maxim been modified. Here no such interests intervene. See Wharton's Legal Maxims, p. 161, Maxim 73.

With two propositions established, that the strip of land four hundred feet wide and its adjuncts, viz., land for houses, etc., are exempt, and that the track and buildings are part of this land, we are led to the only remaining inquiry, which is, Does this complaint bring this case within an acknowledged head of equity jurisdiction? By three distinct allegations, the equitable interference of a court of equity is justified. 1st. The county is insolvent. 2d. Evidence of invalidity of tax is in danger of being lost. 3d. Tax is a cloud on the title of plaintiff.

It would be pedantry to quote authorities to maintain that either of these causes justify equitable interference, and we content ourselves with the presumption that authorities would not aid the court to a conclusion.

The argument thus far proceeds on the presumption that an assessment has been made of this property. But no assessment was in truth ever made, and, therefore, no tax is due.

Section 1007 of the Revised Statutes of Montana creates a system of taxation by itself. It, so far as it prescribes a method of assessment, is *sui generis.* To assess the property of corporations constructing railways, its provisions prescribe to the assessor an exact line of duty. This assessment, in the manner set forth in that statute, is a jurisdictional question, and it is so held by all authority. See Cooley on Taxation, 259; 3 Mass. 429; 4 Watts, 351; 57 Pa. St. 13.

Besides, the confusion of real and personal property is contrary to the express command of the statute (see secs. 1013, 1015), and in such cases no tax can be collected. See Cooley on Taxation, pp. 279–295; Mont. Stat. 1022–1024.

Taxation has been defined a power to destroy. Cooley on Taxation, 495.

No party is compelled to pay taxes for which the authorities are unable to show a legislative grant of power. Cooley on Taxation, 474.

Where a notice is required, failure to give it deprives the party of the right to be heard, and the defect is jurisdictional.  Cooley, pp. ——.

If, by law, lands are exempt, their sale is void for tax actually assessed.  Cooley on Taxation, 322; *Hobson* v. *Dutton,* 9 Kans. 477.

If one condition precedent to the validity of a tax fails, it is as fatal as if all failed.  Cooley on Taxation, 324.

Courts cannot aid a defective execution of a statutory power.  Cooley, 324.  See, also, *Hills* v. *Exchange Bank,* 105 U. S. Sup. Ct. 319; also, *Huntington* v. *C. P. R. R.* 2 Sawyer, 503.

J. A. JOHNSTON, District Attorney, for respondent.

I. The assessment and levy of the tax in this case, and all proceedings had thereunder, are in accordance with the laws of Montana territory.  R. S. 1879, p. 618, sec. 1007; p. 620, sec. 1015; p. 618, sec. 1011.

II. There is no averment in the complaint that plaintiff had an agent duly authorized to list its property within the limits of the assessor's district.  Besides this, the action of the assessor in the particular complained of was entirely legal.  High on Injunctions, sec. 356.

III. When said assessment was so legally made, the statute clearly points out plaintiff's duty in the premises and furnishes the remedy (R. S. p. 621, sec. 1020), which fails to provide for excuses, lapse of time or lack of information, unless "read between the lines."  And if the board of county commissioners failed to perform any duty in the premises as a gratuity, it may be suggested that plaintiff's sole remedy was by the writ of mandate against said board of county commissioners.

IV. It is submitted that this form of action cannot be maintained against the defendant, who, by the averments

of the complaint, is the treasurer and tax collector of Custer county, and whose official action has been shown to be in compliance with the requirements of the laws of Montana territory. High on Injunctions, sec. 355, and note 3.

With reference to the claim of the plaintiff, that its right of way, road-bed, etc., is exempt from taxation in the territories by the terms of their act of incorporation, it is submitted that said provision is unconstitutional and is in direct conflict with the spirit of section 8 of article 1 of the constitution of the United States, and with both the spirit and letter of section 1 of article 14 of the amendments thereto.

If these views are correct, the question is disposed of, and the action of the court below in sustaining the demurrer was right.

WADE, C. J.  This is an action in the nature of a bill in equity to enjoin the collection of a tax assessed by the assessor of Custer county, which the treasurer thereof, the defendant herein, is attempting to collect, upon "twenty miles of railroad and rolling stock" of the plaintiff, situated in said county of Custer and territory of Montana. There was a demurrer to the complaint, which was sustained, and the plaintiff abiding its complaint, judgment was rendered for the defendant, from which plaintiff appeals.

The action was commenced in the district court of the first judicial district, at Bozeman, Gallatin county, sitting to hear and determine causes arising under the constitution and laws of the United States, and the complaint alleges the creation and corporate existence of the plaintiff under an act of congress of July 2, 1864, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound on the Pacific coast, by the northern route." The complaint, in substance, further alleges:

That by the terms of said act plaintiff's right of way through the public lands is two hundred feet in width on each side of said railroad, and in addition thereto includes all necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turn-tables and water stations, which right of way and necessary ground is exempt from taxation in the territories of the United States; that notwithstanding said exemption the assessor aforesaid, on the 5th day of September, 1881, without notice to plaintiff or its authorized agent at Helena, in said territory, whose duty as to returning assessments of plaintiff's property for taxation in the territory were those of secretary or clerk, named and mentioned in the territorial laws, did then and there value and assess the personal property of the plaintiff, in said county, for taxation at $15,500, and did assess, value and return as assessable valuation in said county " twenty miles of railroad and rolling stock," at $200,000, to the commissioners of said county, who then and there, without the knowledge of plaintiff or its agents in that behalf, approved of said valuation, and levied a tax thereon, amounting to twenty-five mills on each dollar thereof, and thereby made it the duty of the treasurer of said county to collect said tax; that the plaintiff paid the tax upon said $15,500 of personal property, and applied to the board of county commissioners of said county at their December session, 1881, to remit the tax on twenty miles of railroad and rolling stock, so valued by said assessor at $200,000, which the board refused to do, and neglected to make any record of said application; that the plaintiff, before the commencement of this action, appraised at its true value the rolling stock on said twenty miles of road, and has tendered to the defendant the taxes thereon, amounting to the sum of $440, and brings the money into court; that the assessment and levy of said tax upon said twenty miles of said road, valued at $180,000, is evidenced by a record in the

hands of the defendant, which tax he is proceeding to collect, and the same is a lien upon the real property of the plaintiff in said county, and a cloud upon its title; that, unless the defendant is enjoined, he will levy upon and sell the personal property and real estate of the plaintiff for said tax; and that for the wrong thus impending there is no plain, speedy or adequate remedy at law, but that the injury so threatened is, and will be, and remain, irreparable.

That Custer county is largely indebted, to wit, in the sum of more than $100,000, and has no money in its treasury applicable to pay any claim of plaintiff against the county, if it should pay said tax and sue the county, and recover a judgment for the same; that the taxes collected in said county are applicable by law to the payment of the necessary current expenses and interest upon warrants and the bonded indebtedness of the county, which warrants and bonds are payable in the order in which they were issued; that the warrants of said county are worth but eighty cents on the dollar, and subject to long delays in their payment, in consequence of the large indebtedness aforesaid, wherefore a judgment at law for the taxes so to be paid by plaintiff, or collected, if the treasurer should collect the same, would be wholly inadequate as a remedy to the plaintiff; that the railroad so assessed is the right of way and fixtures thereon mentioned in the act of congress, and thereby exempt from taxation in the territory of Montana and the other territories of the United States, the said twenty miles of railroad being on what was, July 2, 1864, the public domain of the United States; that said assessment, valuation and return of the assessor was made upon a blank form in his hands, which, when returned, showed that an assessment had been made by him on the 5th day of September, 1881, on "twenty miles of railroad and rolling stock" in said county, which said return has since been lost, and the evidence, whether said $215,500

so assessed is on real or personal property, right of way or rolling stock of plaintiff does not appear on the books of the treasurer or the archives of the county, and the proof thereof, which must be produced from other sources, is liable to be lost, and the plaintiff, by reason of the death of its witnesses, may be unable hereafter to prove the assessment upon its right of way, which it is now able to do; that the assessment of plaintiff's right of way is and was fraudulent, and that any assessment thereof, without notice to its general agent, is and was fraudulent and void, and, because of said exemption, the assessment thereof was beyond the authority and jurisdiction of the assessor, wherefore plaintiff prays judgment that the claim of defendant to recover or collect said taxes, remaining unpaid, be declared invalid; and that he and his agents, and successors in office, be enjoined from collecting the same.

Upon this state of facts and allegation the following questions arise for determination: (1) Was the action commenced in the proper court? (2) What is included in the right of way, which, by the terms of the act, is exempt from taxation? (3) Was it within the constitutional power of congress to so exempt said property from taxation? (4) If the property was subject to taxation, was the tax assessed and levied as our statute requires? (5) In what cases and under what circumstances will the collection of taxes be enjoined?

1. Our district courts, sitting to hear and determine causes arising under the constitution and laws of the United States, have the same jurisdiction as the circuit and district courts of the United States. Our organic act provides (section 9): "And each of said district courts shall have and exercise the same jurisdiction, in all cases arising under the constitution and laws of the United States, as is vested in the district and circuit courts of the United States, and the first six days of each term of said courts, or so much thereof as may be necessary,

shall be appropriated to the trial of causes arising under the said constitution and laws."

When does an action arise under an act of congress? Judge Deady, in *Hughes* v. *Northern Pac. R'y Co.* 18 Fed. Rep. 106, answers this question, and says: "A controversy which turns upon the existence, effect or operation of the act of congress arises under such act, and a suit brought to determine the same is a case arising under such act, within the meaning of the statute."

The supreme court of the United States, in *Osborn* v. *U. S. Bank*, 9 Wheat. 816, decides that a suit by or against a corporation created by act of congress is necessarily a case arising under the laws of the United States, and therefore within the jurisdiction of the circuit court. By section 1 of the act of congress of March 3, 1875 (18 U. S. St. 470), jurisdiction is conferred upon the circuit court, in all cases arising under the laws of the United States, as follows: "That the circuit courts of the United States shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum of $500, and arising under the constitution and laws of the United States."

Says Judge Deady, in *Hughes* v. *Northern Pac. R'y Co.*, *supra:* "The effect of this legislation in the ruling in *Osborn* v. *U. S. Bank, supra,* is equivalent to a special clause in the charter of the Northern Pacific authorizing it to sue and be sued in the circuit courts in all cases. To the same effect, see *Fisk* v. *U. P. R'y Co.* 6 Blatch. 365."

If this suit would have been properly commenced in the circuit court of the United States, then it is properly commenced in a court having like jurisdiction to that of the circuit court, and such is the jurisdiction of our territorial district courts when sitting to hear and determine

causes arising under the constitution and laws of the United States.

2. Section 2 of the act incorporating plaintiff provides as follows: "That the right of way through the public lands be, and the same is hereby, granted to said Northern Pacific Railroad Company, its successors and assigns, for the construction of a railroad and telegraph, as proposed. . . . Said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary ground for station buildings, work-shops, depots, machine-shops, switches, side tracks, turn-tables and water stations; and the right of way shall be exempt from taxation within the territories of the United States." 13 U. S. St. 367.

Whatever interest the plaintiff acquired in the lands described in its right of way is an interest evidenced by a grant. The United States being the owner of the public lands in the territories, and having the right to dispose of the same, declared "that the right of way through the public lands be, and the same is hereby, granted to the Northern Pacific Railroad Company, its successors and assigns;" and the purpose of the grant is "for the construction of a railroad and telegraph line" over and through the right of way so given and granted to the company. The right in the company is vested and exclusive. It is an easement in the land described in the right of way. It is a freehold interest in the soil, having all the properties of realty. If it belonged to an individual it would descend to his heirs, and can only be conveyed by deed. Within the boundaries of the right of way, as described in the grant, personal property used in constructing and operating the road, attached to the soil and annexed to the easement, becomes a part of the real estate of the company. A right of way over or through land is an easement, and an easement is an interest in the soil, such an interest as that when personal

property is attached to it, it becomes a part of the realty. These propositions seem to be in harmony with the authorities.

In the case of the *Appeal of the N. B. & M. R. R. Co.* 32 Cal. 506-512, Judge Sawyer, speaking for the supreme court of California, has determined what passes by the grant of right of way to a railroad company, and in reviewing the authorities in an able opinion, says:

"Under the act of April 17, 1861 (St. 1861, p. 193), the appellant acquired 'the right of way whereon to construct and lay down a railroad track within the corporate limits of the city and county of San Francisco, and to run horse cars thereon' through certain designated streets, embracing the whole of that portion of Kearney street proposed to be widened, and extending in each direction a considerable distance beyond. It was authorized to lay down a track for its cars to run upon, and to receive five cents fare from each passenger for any distance carried in said cars. This right of way is at least an easement in said street. So much is admitted by appellant's counsel. But an easement is property, recognized as such by law, and one of the kind in question, very valuable property. It is an incorporeal hereditament, but it is still a tenement and an interest in the land. 'An easement always implies an interest in the land in or over which it is to be enjoyed. A license carries no such interest. The interest of an easement may be a freehold or a chattel one, according to its duration.' Washb. Easem. p. 5, par. 5. 'An easement must be an interest in or over the soil.' Per Cresswell, J., in *Rowbotham* v. *Wilson*, 8 El. & Bl. 157. 'A right of way is an assignable property. It is a real or chattel interest, according to the term of its duration, and the former is well known in the law as that sort of real property belonging to the class of incorporeal hereditaments.' *Ex parte Coburn*, 1 Cow. 570; *Heaton* v. *Ferris*, 1 Johns. 146. It is real property, and it is created by grant. An

easement is an estate or interest in land within the stat-
ute of frauds requiring contracts affecting real property
to be in writing.     *Wolfe* v. *Frost,* 4 Sandf. Ch. 89; *Foster*
v. *Browning,* 4 R. I. 51.     By act of parliament (10 Anne),
certain parties were 'authorized and empowered, at their
proper costs and charges, to make the river Avon, from
the city of Bath down to and within the mill-pool or wear-
pool below Harmon mills and wear, not exceeding one
hundred and fifty yards, navigable, useful and passable for
boats, lighters and other vessels,' and to take certain tolls
from those navigating the said portion of said river.
*Buckeridge* v. *Ingram,* 2 Ves. Jr. 654.     The interest of the
parties in the soil of that portion of the river is but an
easement, similar to that acquired by the appellant in
this case.     Yet, shares in the improvement were held to
be real estate and subject to dower.     The master of the
rolls, citing Lord Coke, says: 'And according to that
passage, every hereditament which in any degree arises
out of land, affects the same, or is exercisable within the
same, has all the properties that belong to real estate.
.  .  .     When we come to try the question by the test
of that definition, it would be strange to say the right of
making all these cuts and erections, and receiving certain
tolls, payable by all persons and goods navigating that
part of the river, does not savor of realty.     It not only
does, but it partakes of it.     It is not the soil, which I
hold would hardly pass to the grantee, but it is a right
arising out of the soil.     The land itself includes every
profit that can be made out of land.     Therefore, this act
cannot be construed to have taken out of the proprietors,
and given to this corporation, the soil; but it has given
them the right in and over the soil, and certain rights
arising in and out of the soil.  .  .  .     I have no diffi-
culty in saying that whenever a perpetual inheritance is
granted, which arises out of lands, or is in any degree
connected with, or, as it is emphatically expressed by

Lord Coke, exercisable within it,— it is that sort of property the law denominates real, and cannot pass by a will without three witnesses.' Id. 633. Having determined the interests to be real estate, he held the shares subject to dower. ' The whole estate of the Chesapeake & Ohio Canal Company, at least so far as it consists of the canal itself, and its necessary buildings and fixtures attached to them, must, according to the common law, be regarded as realty.' *Binney's Case,* 2 Bland, Ch. 145. When a party conveys land bordering upon a navigable river upon which a ferry is established, but excepts therefrom his right to hold and maintain the ferry the ferry right does not pass, and it is real estate, 'and subject to the laws which govern realty.' *Bowman's Devisees* v. *Wothen,* 2 McLean, 385–388. ' The statute of Indiana recognizes the right of proprietors of land on the margin of the river, and to none others can ferry rights be granted, and it is supposed that this limits the right to the grantee of the soil. But this construction cannot be sustained. By the statute nothing more could have been intended than to rescue from violation the right of the riparian proprietor. This right is appurtenant to the soil; but he may convey it, and still retain the fee in the land. And by such conveyance, the grantee holds the right which the statute was designed to protect. He has the use of the soil for the ferry landing, and for ferry-ways, so far as the public accommodation is concerned, as fully and completely as could be exercised by the grantee of the soil, but for no other purpose has he a right to enter upon the soil. Now, it must be presumed that the right thus possessed is as much within the policy of the statute as if it were a fee-simple in the soil. Indeed, it is within the letter of the statute; for the grantee of such a right may, in the strictest sense, be considered, for all the purposes of the ferry, the proprietor of the land on the margin of the river. This right, as before remarked, is

real estate. It descends to heirs as such, is subject to dower, and to all the incidents of real property.' Id. 389, 390.

"The statutes of Rhode Island provide that 'the assessors of taxes in the several towns, in assessing taxes for real estate, may assess the same, either upon the owners of the real estate, or upon the persons who hold or occupy the same.' *Prov. Gas Co.* v. *Thurber*, 2 R. I. 21. Under this provision the Providence Gas Company was assessed for its gas pipes laid in the streets of the city, valued as real estate at $50,000. Id. 15. The gas pipes having been permanently attached to the soil, and united to the easement of the company in the land, were held to become a part of the realty, and to be properly taxed as real estate. The court say: 'If these pipes had been laid in the land of an individual by parol license, they would not become fixtures thereby. But if the owner had granted, by deed, the right in the fee to lay pipes through his land, they would be fixtures, because the annexation would be under legal title. . . . What then is the nature of the right which plaintiffs take under their charter? We think, when exercised, it is an easement, an incorporeal hereditament, like the right of a railroad company to build and occupy their road, or a canal company their canal, under the provisions in their charter which grant the power to take the land, upon rendering compensation to the owners. . . . But the tax has not been assessed upon the plaintiffs as occupants of the land by their pipes, etc., but upon their pipes as real estate. And these pipes being annexed to the freehold, and the gas company having an easement in fee, or a right so to annex and use them, we think they are fixtures, and rightfully assessed as real estate. Id. 26. So, also, the Providence & Worcester Railroad Company owned 'in fee an easement in certain real estate in said town, said estate, so owned by said company, being the location, sleepers, rails and bridges, etc., of the Provi-

dence & Worcester Railroad,' lying within the limits of
the charter.   Under the same act this property was as-
sessed as real estate, and the question was whether it
was liable to be assessed.   The court say: 'We have no
doubt the easement of the plaintiffs, and their rails,
bridges, sleepers, etc., are real estate, and subject to tax-
ation, within the decision of the court in the case of
*Providence Gas Co.* v. *Thurber*, unless exempted by sec-
tion 28, etc.   . . .'   *Prov. & W. R. R. Co.* v. *Wright*,
2 R. I. 462.   So in New York, under the general statutes
requiring 'all real and personal estate' to be assessed for
taxation at its full and true value, land occupied by the
road, the superstructure, and other fixtures, is taxed as
real estate in all respects like other lands.   *Alb. & Sch.
R. R. Co.* v. *Osborn*, 12 Barb. 225; *Alb. & West Stock-
bridge R. R. Co.* v. *Town of Canaan*, 16 Barb. 247.   The
same is true of Illinois.   *Sangamon & M. R. R. Co.* v.
*Morgan*, 14 Ill. 166.   . . .

"A turnpike company has but an easement in the soil,
yet it has an estate — a property in it — which can no
more be taken for the use of a railroad, without compen-
sation, than the interest in the soil held by the owners
of the fee.   When a railroad crosses a turnpike, com-
pensation must be made to the turnpike company.   In a
case of assessment for damages resulting from the cross-
ing of a turnpike by a railroad, Mr. Justice Harris speaks
of the interest of the former as real estate.   He says:
'So far as the railroad company had occasion to take the
real estate of the turnpike company, so far they were
bound to make compensation.'   *Troy & B. R. R. Co.* v.
*North Turnpike Co.* 16 Barb. 106.   So a railroad com-
pany which exclusively uses the road by cars propelled
by steam, cannot appropriate a public highway as a part
of its road, without making compensation to the owner
of the fee of the land upon which the highway is lo-
cated.   This is imposing a new burden upon it beyond
the easement already acquired by the public.   A new

estate is to be carved out, which can only be acquired by the railroad company by contract with the owner of the fee, or by condemnation and payment of compensation under the right of eminent domain. *Williams* v. *N. Y. Cent. R. R. Co.* 16 N. Y. 100; *Mahon* v. *N. Y. Cent. R. R. Co.* 24 N. Y. 658; *Wager* v. *Troy Union R. R. Co.* 25 N. Y. 526; *Waterloo* v. *Aub. R. R. Co.* 3 Hill, 569. In the first case the court says: 'The right of the public in a highway is an easement, and one that is vested in the whole public. Is not the right of a railroad company, if it has a right to construct its track upon the road, also an easement? This cannot be denied; nor that the latter easement is enjoyed, not by the public at large, but by a corporation, because it will not be pretended that every man would have a right to go and lay down timbers and his iron rails and make a railroad upon a highway. Here, then, are two easements, — one vested in the public, and the other in the railroad company. These easements are property; and that of the railroad company is valuable.' 16 N. Y. 108. And it is property that must be acquired by purchase, — by contract with the owners of the fee, — or by making compensation in the mode prescribed by law in the exercise of the right of eminent domain. The sovereign power has no authority to convey it as a part of the franchise. By virtue of its franchise it may be endowed by the sovereign power with capacity to acquire the easement, hold property, and exercise the functions with which it is endowed; but it is beyond the power of the government itself to endow it with the easement, confer upon it the property, the interest, or estate in the lands not owned or controlled by the sovereign power. That interest is property, as distinct from the franchise, and must come through purchase and payment of the consideration like any other property. So, also, in a recent case in New York, in which the power of the corporate authorities of New York city to authorize certain parties to construct a

street railroad in Broadway, the character of the rights and interests of street railroad companies was involved. In speaking of the resolution authorizing the parties to construct the road, the court say: 'Upon its acceptance (if valid), it became a contract between two parties binding each to the observance of all of its provisions. It was something more than a mere executory contract between the parties. *It amounted also to an immediate grant of an interest, and it would seem, of a freehold interest, in the soil of the street to the defendants. The rails, when laid, would become part of the real estate, and the exclusive right to maintain them perpetually is vested in the defendants, their successors and assigns.* . . . The title to the rails, when permanently attached to the land, and such right in the land as may be requisite for their perpetual maintenance, are therefore granted to the defendants by the resolution. The exclusive use of the rails, when laid for the purpose for which they were designed, would also, I think, belong to the defendants. Other people might drive across them, and to some extent along them, with ordinary carriages, but they would have no right to run cars upon them for their own convenience or profit. Any use which the public could have of them, not exercised through the defendant's franchise, would depend upon the fact that the rails would not entirely exclude from the ground they might occupy the character of a public street.' *Milhau* v. *Sharp*, 27 N. Y. 620, 621. 'The resolution is therefore void, for the reason that it purports to create a franchise which the common council had no power to create; *to vest in the defendants an exclusive interest in the streets which the common council had no power to convey;* and to divest the corporation of the exclusive control over the street which has been given to it as a trust for the use of the public, and which it is not authorized to relinquish.'" Id. 622.

Judge Sawyer's conclusion from these cases is that the

appellant, who, under the act of April 17, 1861, had ac-
quired "the right of way whereon to construct and lay
down a railway track within the corporate limits of the
city and county of San Francisco, and to run horse cars
thereon," through certain designated streets, thereby ac-
quiring "*an interest in the soil in Kearney street; that it
consists in the location of the road in the street, its right
to lay down rails and attach them to the soil, and to run
its cars over them for profit; its right to the exclusive
use of them and the street, so far as it is necessary for
the purpose in the mode prescribed; that this interest is
property,— an interest in the land,— and that it is real
estate, and the rails thus laid down, attached to the soil
and annexed to the easement, became themselves a part
of the land — of the estate of the company; and that in
those states where no special provision is made for tax-
ing this species of property in a different mode, it is as-
sessed as real estate in the same manner, and upon the
same principles, as land, as if the company owned the
land itself upon which the track is laid, to the extent of
its interest in it.* . . . It is as immovably established
on the particular portion of the earth as the lot occupied
by stores fronting on the same street; and the estate in
the one can no more be enjoyed, away and apart from
its fixed locality, than the estate in the other; and the
right of the street railroad company to the exclusive con-
trol and enjoyment of its estate in the soil of the street,
to the full extent of that estate, is as perfect as the right
of the lessee or owner of the lot fronting on the same
street to control and enjoy its estate.     The several estates
are substantially of the same kind, and are of equal dig-
nity before the law, but one is larger, more extensive,
than the other.     Practically, they differ only in the quan-
tity of interest, not in quality."

The following cases have been decided since the decis-
ion of Judge Sawyer:

In the case of *People* v. *Cassity,* 46 N. Y. 46, says Folger,

J.: "The property assessed in this case is the track of the relators, consisting of its stringers, ties and rails. This track is laid down in the public highway, and the relators have or claim no interest in the lands of the highway, save a right to use the same for the passage of their teams and vehicles, to and fro, over the track. This right they claim and doubtless have. And it includes a right to the constant and exclusive, and for the extent of their chartered existence, the lasting, use of the soil for the support of their track. It is an easement (*Williams* v. *N. Y. Cent. R. R. Co.* 16 N. Y. 97; *Craig* v. *R. & B. R. R. Co.* 39 N. Y. 404), and this is an interest in the land over which it is enjoyed. Washb. Easem. 6. It gives them the right of the exclusive possession as from time to time they shall need to use any part of it.

"By the statutes in relation to assessments and taxation (1 R. S. 360, §§ 1, 2), 'all lands within this state, whether owned by individuals or by corporations, shall be liable to taxation. The term *land* shall be construed to include the land itself and all buildings and all other articles erected upon or affixed to the same, and the terms *real estate* and *real property* shall be construed as having the same meaning as the term *land* thus defined.' . . . We are not inclined to give to the terms of the statute a construction so narrow as that required by the position of the relators. That would be to hold that buildings and fixtures are not included in the term 'land,' except as inseparable, in consideration of the ownership thereof, from the ownership of the fee; and that no right or interest in land less than the fee thereof would, for the purpose of the assessment, be deemed to fall within the meaning of 'land,' as set forth in the statute. The statute means, for this purpose, to make two general divisions of property — one all lands, another all personal estates; and then, to be more definite, it declares that by land is meant the earth itself, and also all buildings and other articles erected upon or affixed to

the same.  We do not think that when buildings or other articles are erected upon or affixed to the earth, they are not, in view of the statute, land, unless held and owned in connection with the ownership in fee of the soil.  We are of the opinion that the statute means that such an interest in real estate as will protect the erection, or affixing thereon, and the possession of buildings and fixtures, will bring those buildings and fixtures within the term 'lands,' and hold them to an assessment as the lands of whomsoever has that interest in the real estate, and owns and possesses the buildings and fixtures.  The defendants were right, then, in considering the track of relators as land, and liable to assessment as such.  See *People* v. *Beardsley*, 52 Barb. 105, since affirmed in this court."

In the case of *The City of New Haven* v. *F. H. & W. R. R. Co.* 38 Conn. 421, Carpenter, J., speaking for the supreme court of Connecticut, says: "This action is brought to recover the amount of benefits assessed upon the defendant for its proportional part of the expense incurred in paving a portion of Chapel street, in New Haven, in and through which the defendant's railroad track is laid.  The defense is — *First,* that the defendant is not liable to assessment. . . .  The defendant's property consists in part of rails, sleepers, ties and spikes, so laid into and attached to the soil in the street where the improvement was made as to become a part of the realty.  That property so situated is real estate has been repeatedly decided.  *Prov. Gas Co.* v. *Thurber*, 2 R. I. 21; *City of Chicago* v. *Baer*, 41 Ill. 306; *Appeal of North Beach & M. R. R. Co.* 32 Cal. 499; *Farmers' Loan & Trust Co.* v. *Hendrickson*, 25 Barb. 494.  We entertain no doubt that this ought to be regarded as real estate, and, as such, liable to assessment like any other real estate especially benefited, unless there is something in the charter showing that the legislature did not intend that this species of property should be assessed."

These decisions, and the reasoning thereof and the anal-

ogies of the law, seem to conclusively establish the proposition that the right of way granted to the plaintiff is, for all the purposes of this case, real estate, having all the properties that would attach to a grant of the land itself. If this be true, and this right of way is land or an easement in land, which implies an interest therein (1 Washb. Real Prop. 543) to such an extent that personal property attached to the soil and annexed to the easement becomes a part of the land itself, then the other important consequences follow. "Whatever is affixed to the soil belongs thereto." *Quicquid plantatur solo, solo cedit.* Broom, Leg. Max. 299. Land, according to Lord Coke, includes not only the ground or soil, but everything which is attached to the earth, whether by the course of nature, as trees, herbage and water, or by the hand of man, as houses or other buildings, and which has an indefinite extent upwards as well as downwards, so as to include everything terrestrial, under or over it. Co. Litt. 4*a;* 3 Kent. Comm. 509; 2 Bl. Comm. 18. Whatever is built on the soil is an accessory of the soil. Bouv. Inst. § 1571. It follows from these propositions that the road-bed, the rails fastened to it, station buildings, workshops, depots, machine-shops, etc., constructed over, upon or through the right of way granted to the plaintiffs and attached to the soil, and annexed to the easement, become a part of the real estate of the railroad company.

Says Washburn (1 Washb. Real Prop. 3): "Thus the road-bed, the rails fastened to it, and the buildings at the depots of railroads, are real property."

Caton, C. J., speaking for the supreme court of Illinois, says: "We are of the opinion that the rolling stock, rails, ties, chairs, spikes, and all other material brought upon the ground of the company incumbered by the mortgage and designed to be attached to the realty, should be considered as a part of the realty, and incumbered by the mortgage as such."

There is another principle that ought to give some

light on this question. "It is a general rule that a grant
of power to accomplish any particular enterprise, and
especially one of a public nature, carries with it, so far as
the grantor's own power extends, an authority to do all
that is necessary to accomplish the principal object."
"It is a well known and reasonable rule, in construing a
grant, that, when anything is granted, all the means to
attain it, and all the fruits and effects of it, are granted
also." Shaw, C. J., in *Babcock* v. *Western R. R. Corp.*
9 Metc. 555. Here is a grant of a right of way through
the public lands "for the construction of a railroad and
telegraph." Such a grant carries with it the right to the
exclusive possession of the lands described for the pur-
pose aforesaid; to make excavations, cuts and fills in the
soil or ground; to construct a road-bed of suitable width
and grade; to lay ties and rails thereon, and to erect upon
the lands described, as and included in the right of way,
all buildings, shops, water stations, depots, etc., neces-
sary and suitable to be used in constructing or operating
such railroad. This right necessarily implies property in
the ground itself. This property is real estate, and the
title to it is a legislative grant. By virtue of this grant
the railroad company acquired the same interest in the
land as if it had received a deed of the land for the pur-
pose of constructing and operating a railroad. The pro-
vision contained in section 2 of the act incorporating
plaintiff, declaring that "the right of way shall be ex-
empt from taxation within the territories of the United
States," therefore carries with it, and exempts from tax-
ation within the territories, the road-bed, the ties, and
rails thereto attached, and all the station buildings, work-
shops, etc., necessary for the construction and for oper-
ating said railroad; and the assessment for taxation and
levy of tax thereon of "twenty miles of railroad" in the
county of Custer, as mentioned and described in the com-
plaint, which description must include the road-bed, ties
and rails, and all necessary buildings attached to the soil

and annexed to the easement of the right of way, was unauthorized, and is illegal and void.

3. But if the property was subject to taxation, was the tax assessed and levied as our statute requires? As to the taxation of railroads, the statute of the territory pro-vides as follows (sec. 1007, R. S. p. 618): "The property of corporations or companies constructing bridges, canals, ditches, flumes, railways, plank roads, graded roads, turnpike roads, telegraph lines and similar improvements, shall be assessed to each corporation or company, and their interests are to be taxed in this territory, in the county or localities in which such bridges, railways, etc., may be, and to the extent of such improvements as may be found, in the county, or counties, in which the same may be situated; and to this end the assessor is directed to require the secretary or clerk, or whatever officer of corresponding duties there may be, to render upon oath a list of the number of miles and value of such improvements as may be in each separate county through which the same may be constructed, or in which the same may be situated."

Section 1013 provides that the assessor's list shall contain: *First,* the *land* and a description thereof; and *second,* the *personal property;* and section 1015, that the assessor shall make out and deliver to the county clerk an assessment roll containing the names of the persons and bodies in whose names property has been listed, *with the several species of property, and the value as herein-before indicated,* that is, as indicated in section 1013.

The allegations of the complaint, as to the assessment of this property, are as follows: "That on the 5th day of September, 1881, it (the plaintiff) had certain personal property, and twenty miles of its said road provided in said act to be built, then and there constructed and lying in said county, and then had its principal office and head-quarters in the city of St. Paul, in the state of Minnesota, and a general agent at Helena, Montana, whose duties

as to the return and valuation and assessment of its property for taxation correspond with and were those of the secretary or clerk named and mentioned in the law of the territory, and who might have been applied to by the assessor of said county and required to list its property liable to taxation, but its said general agent was not so applied to to list its taxable or other property in said county by said assessor for taxation for that year, nor was any person so applied to by said assessor whose duties were equivalent to or correspond with those of the secretary or clerk in the law of the territory mentioned; but the assessor of said county, on the said 5th day of September, 1881, without the authority of law, did, himself, then and there, assume and pretend to make a list of the property of this plaintiff in said county, and value the same for the purpose of taxation for that year, and did then and there value and assess the personal property of the plaintiff for taxation at $15,500, and did assess, value and return as assessable valuation in said county, 'twenty miles of railroad and rolling stock' at $200,000 to the commissioners, without notice thereof to the company."

Section 1011 of the statute provides that the assessor shall assess and value all property required by the law to be assessed and valued, and, between the 1st day of February and the 10th day of September, in each year, shall demand of each tax-payer in his district a list, as hereinafter provided, of his, her or their property; and if such list be not rendered under oath at the time such demand be made, the assessor shall proceed to list and assess the property of such tax-payer according to his best knowledge and information. A legal assessment is the foundation of a legal tax. The assessor derives his authority from the statute, and in order to give him jurisdiction to act, or to clothe his official acts with any potency or efficacy, the provisions of the statute must be particularly followed. Says Judge Cooley: "Of the

necessity of an assessment no question can be made. Taxes by valuation cannot be apportioned without it. Moreover, it is the first step in the proceedings against individual subjects of taxation, and is the foundation of all which follows it. Without an assessment they have no support, and are nullities. It is, therefore, not only indispensable, but, in making it, the provisions of the statute under which it is to be made must be observed with particularity. . . . As the course unquestionably is prescribed in order that it should be followed, and as, without, the citizen is substantially without any protection from unequal and unjust demands, the necessity for a strict compliance with all important requirements is manifest." Cooley, Taxation, 259, 260. "If the officers were to be at liberty to disregard important provisions of the statute in this initiatory step (making the assessment), the chief protection which the law has intended for individuals in tax cases would be removed." Id. 260.

Under the provisions of our statute it is the first duty of the assesor to demand a list of the property from the tax-payer, or the person whose property is to be assessed. This is the first and important step towards assessing his property for taxation. If the list is not furnished on such demand, then, and not until then, has the assessor the right himself to make a list and value the property. The demand is a condition precedent to the right of the assessor to act in the premises. That, and the neglect or refusal of the person having taxable property, alone gives to the assessor the right to make the list himself. If this were not so, the sovereign power of taxation becomes an arbitrary exaction, subject to the caprices of a single individual, without the knowledge and behind the back of the person most interested, and whose property is to be taken for the public uses. Therefore it is that our statute has wisely provided that the person having taxable property shall have the right to list the same

for taxation.  The assessor has no right or jurisdiction to make the list until the tax-payer or person having property subject to taxation has neglected or refused to make it.

These provisions of the statute are applicable to the assessment of railroads or railroad property for taxation. By section 1007 of the statute the assessor is directed to require the secretary or clerk, or whatever officer of corresponding duties there may be, to render, under oath, a list of the number of miles and value of such improvements as may be in each separate county through which the same may be constructed, or in which the same may be situate.  The right to assess railroads, and the manner in which the assessment shall be made, depends upon this statute.  The assessor, in order to make a valid assessment of railroad property, must, as in other cases, substantially follow the terms of the statute.  By the allegations of the complaint the assessor, before listing and assessing the property in question, made no requisition upon the secretary or clerk of the plaintiff for a list of its property, under oath or otherwise; but without notice to plaintiff, and upon his own motion and knowledge of its value, made the list and assessment upon "twenty miles of railroad and rolling stock " at $200,000. If any regard at all is to be had to the statute providing for the assessment of railroads, certainly this assessment is no assessment, and wholly invalid.  The object of the statute is to require the value of railroads and number of miles in each county to be made on the oath of some one who is supposed to know whereof he speaks, and until the officer (or officers) designated has had an opportunity to make this list, on oath, and has failed or refused so to do, the assessor has no right to list or value the property.  How it would be if the railroad company should neglect or refuse to make this list under the oath of the proper person, it is not necessary to decide, as no such question arises.  By the allegations of the com-

plaint there was an officer of the plaintiff in the territory whose duties correspond to those of the clerk or secretary mentioned in the statute, and who would have made the requisite list on application.

There is another question arising upon this assessment. By virtue of sections 1013 and 1015 of the statute, the list and return of the assessor shall contain a separate and distinct description and valuation of the real and personal property. These two sections, taken together, require the separate listing and separate valuation of the personal and real property, and forbid that the real and personal property be lumped together and assessed in a mass. The reasons for these provisions of the statute are obvious. Unless the real and personal property are separately and distinctly described and valued, it would be impossible for the board of equalization to properly equalize the taxes.

If rolling stock is to be taken as personal property, then, in this assessment of "twenty miles of railroad and railroad stock," there was an unwarranted lumping together and valuation of real and personal property. It is the right of the tax-payer that his personal and real property be separately listed and valued, and he has the right to be heard before the proper tribunal as to the correctness or propriety of such list and valuation. His right so to be heard and to notice of the proceedings is a constitutional right (Cooley, Taxation, 266); and his right to list his property for taxation, or notice thereof, is of the same nature. The assessment and levy of taxes is the exercise of sovereign power. It is taking private property for public uses,— a necessary power in every well regulated government,— but its exercise must be limited and controlled by law, and this law must be substantially observed in order to confer jurisdiction upon the person administering it. No person is required or can be compelled to pay taxes which have not been assessed and levied in pursuance of law. "Defects in the

conditions to a statutory authority cannot be aided by the courts; if they have not been observed, the courts cannot dispense with them, and thus bring into power that which the statute only permits when the conditions have been fully complied with. A statutory power must be executed according to the statutory directions, and, presumptively, any other execution is opposed to the legislative will." Id. 324.

4. Was it within the constitutional power of congress so to exempt said property from taxation? This question must be considered in view of some further provisions of the act incorporating plaintiff. The United States retain a certain interest in the road while it is being constructed and after it is completed. Section 11 of the act incorporating the company provides as follows: "That said Northern Pacific Railroad, or any part thereof, shall be a post route and a military road, subject to the use of the United States for postal, military, naval and all other government service, and also subject to such regulations as congress may impose, restricting the charges for such government transportation."

The government, therefore, retains the right to use the road for any and all government purposes, and the power is left in the government to have such use upon such terms as it may declare.

The Northern Pacific Railroad, when completed, thus becomes an instrumentality of the government for carrying on its important operations. It was decided in the celebrated case of *McCullough* v. *State of Maryland,* 4 Wheat. 316, that such an instrumentality may not be taxed by the state government, for the reason that the power to tax implies the power to destroy; therefore if the states retained authority to tax the instrumentalities by which the national government was carried on, they had the power to destroy the national government and to make its existence depend upon the will of the states. The states retain no such authority. If they did they

are supreme, whereas the people of the United States have declared that the constitution, and the laws made in pursuance thereof, shall be the supreme law of the land.

Since the decision of the case of *McCullough* v. *State of Maryland, supra,* in 1819, and that of *Osborn* v. *Bank of United States,* 9 Wheat. 867, in 1824, it has been the settled doctrine of the supreme court of the United States, says Chief Justice Chase in *Van Allen* v. *The Assessors,* 3 Wall. 591, that congress may constitutionally organize agencies for carrying into effect the national powers granted by the constitution; that these agencies may be organized by the voluntary association of individuals, sanctioned by congress; that congress may give such agencies, so organized, corporate unity, permanence and efficacy; and that such agencies, in their being, capital, franchises and operations, are not subject to the taxing power of the states, has ever been regarded, since those decisions, as the settled doctrine of this court. The reason for this doctrine is stated by Chief Justice Marshall in his opinion in the case of *McCullough* v. *Maryland, supra,* as follows: "That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another; which other, with respect to those very measures, is declared to be supreme over that which exerts the control, are propositions not to be denied."

This doctrine has been limited by subsequent decisions, and the limitation is stated by Miller, J., in the case of *Nat. Bank* v. *Com.* 9 Wall. 353, as follows: "But the doctrine has its foundation in the proposition that the right of taxation may be so used in such cases as to destroy the instrumentalities by which the government proposes to effect its lawful purposes in the states. . . . The principle we are discussing has its limita-

tions — a limitation growing out of the necessity on which the principle itself is founded. That limitation is, that the agencies of the federal government are only exempted from state legislation so far as that legislation may interfere with or impair their efficiency in performing the functions by which they were designed to serve the government. Any other rule would convert a principle founded alone in the necessity of securing to the government of the United States the means of exercising its legitimate powers into an unauthorized and unjustifiable invasion of the rights of the states. . . . It is only when the state law incapacitates (these agencies) from discharging their duties to the government that it becomes unconstitutional."

Therefore, it conclusively appears that the federal government had the right to incorporate the Northern Pacific Railroad Company; to grant to it the right of way through the public lands; to make such road an instrument of the government for carrying on its legitimate and constitutional operations; and to exempt said right of way from state or other taxation, — provided such taxation would destroy or incapacitate such instrumentality for the purpose for which it was created. Whether the tax levied against the plaintiff on its right of way through the public lands would do this or not does not appear, but the government had the right and authority to so exempt said right of way from taxation, in consideration that the road, when constructed, should be subject to the use of the government for the purposes named in the act of incorporation. The act of incorporation is a contract, and the exemption of the right of way from taxation is founded on a valid consideration. This contract cannot be impaired either by state or national legislation.

In 1853 the legislature of the state of North Carolina chartered the Wilmington & Raleigh Railroad Company. One section of the charter contained the following pro-

vision: "*and the property of said company, and the shares therein, shall be exempt from any public charge or tax whatsoever.*" With this charter in force, the franchise and rolling stock of the company were assessed under a subsequent law, and pursuant to it, for taxation by the state. In deciding the case, Justice Davis (*Wilmington Railroad* v. *Reid*, 13 Wall. 266) says: "It has been so often decided by this court that a charter of incorporation granted by a state creates a contract between the state and the corporation which the state cannot violate, that it would be a work of supererogation to repeat the reasons on which the argument is founded. It is true that when a corporation claims an exemption from taxation it must show that the power to tax has clearly been relinquished by the state; and if there be a reasonable doubt about this having been done, that doubt must be solved in favor of the state. If, however, the contract is plain and unambiguous, and the meaning of the parties to it can be clearly ascertained, it is the duty of the court to give effect to it, the same as if it were a contract between private persons, without regard to its supposed injurious effects upon the public interests. . . . There is no difficulty whatever in the case. The general assembly of North Carolina told the Wilmington & Weldon Railroad Company, in language which no one can misunderstand, that if they would complete the work of internal improvement for which they were incorporated, their property and the shares of their stockholders should be forever exempt from taxation. . . . It is needless to argue the point further. It is clear that the legislation in controversy did impair the obligation of the contract which the general assembly of North Carolina made with the plaintiff in error."

And for this reason the judgment of the supreme court of North Carolina was reversed.

In the case of *Neustadt* v. *Illinois Cent. R. Co.* 31 Ill. 484, Justice Breese, speaking for the supreme court of

the state of Illinois, said:   "In consideration of the undertaking of the company to construct a great thoroughfare, which should involve the expenditure of millions, and which was an experiment, and seven per cent. of the gross amounts of its receipts or income to be paid to the state, the company was relieved from the payment of all other than state taxes, to be assessed as provided in this section (of the charter).   The language is plain and explicit: 'The corporation is hereby exempted from all taxation of every kind, except as herein provided for.' This being the contract between the state and the corporation, no city or town authority can impose a tax for municipal purposes on the property of the company which may be within their limits."   *Ill. R. Co.* v. *Co. of McLean,* 17 Ill. 291.

And so it may be said that the government of the United States told the Northern Pacific Railroad Company, in language which no one can misunderstand, that if they would construct and complete their great work of internal improvement, which was an experiment, involving the expenditure of millions of money, the right of way through the public lands in the territory should be exempt from taxation.   The exemption from taxation formed a part of the consideration for the undertaking and contract on the part of the company.   This contract cannot be impaired by the national legislature, much less by an act of a territorial legislature, which owes its existence to its organic act given by congress.   As well might such territorial legislature undertake to repeal the organic act which called it into being as a territory.

One of the purposes of the government in incorporating the Northern Pacific Railroad Company, and granting to it certain of the public lands, and the right of way through the same, was to promote the public interest and welfare, and to secure to the government at all times the use and benefits of the road for postal, military and other purposes.   Section 20 of the act of incorporation

is as follows: " That the latter, to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefit of the same for postal, military and other purposes, congress may, at any time, having due regard for the rights of said Northern Pacific Railroad Company, add to, alter or repeal this act."

The purpose and object of the government in incorporating the plaintiff was to promote the public interest and welfare, by securing the construction of a railroad extending from the great lakes to the Pacific ocean; and to accomplish this purpose it had the right to contract with any company, and to grant to such company rights and privileges sufficient to carry out and consummate the purpose aforesaid.

But it is contended by counsel for respondent that the provision of section 2 of the act incorporating plaintiff, exempting the right of way from taxation, is forbidden by article 1 of the fourteenth amendment to the constitution, which provides that no state shall "deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." This article is a limitation upon the power of the states, and was intended to secure to all the people of a state, without regard to color, race or previous condition, the benefit and protection of equal laws. It was adopted to secure to the then lately emancipated race all the rights and protection of citizens. It forbids to the states the power to enact laws making any discrimination as to the rights of the citizens, and places all the inhabitants of the state on an absolute equality before the law. This equality is not disturbed by exempting certain property for public uses from taxation when the general public receive the benefits of such exemption.

Justice Field, in expounding the fourteenth amendment to the constitution (*Co. of Santa Clara* v. *Southern Pac. R. Co.* 18 Fed. Rep. 396–400), says:

"Until the adoption of the fourteenth amendment, there was no restraint to be found in the constitution of the United States against the exercise of such power (arbitrary taxation) by the states. In many particulars the states were previously limited; their sovereignty was a restricted one. They could not declare war, nor make treaties of peace. They could not enter into compacts with each other. They could not pass a bill of attainder, nor an *ex post facto* law, nor a law impairing the obligation of contracts. They could not interfere with the exercise of the powers nor obstruct the laws of the federal government. But in many other particulars the powers of the states were supreme, subject to no control by the constitution of the United States. The original amendments were only limitations upon the federal government, and did not affect the states. Among the powers held by the states was the power of taxation. When not interfering with any power or purpose or agent of the federal government, there was no limitation upon its exercise. Except as restrained by their own constitutions, the states might impose taxes upon any property within their jurisdiction; and, as said in the *Delaware R. R. Tax Case,* 18 Wall. 231, the manner in which its value was assessed and the rate of taxation, however arbitrary or capricious, were mere matters of legislative discretion; and it was not for the court to suggest in any case that a more equitable mode of assessment might be adopted than the one prescribed by the legislature of the state.

"The first section of the fourteenth amendment places a limitation upon all the powers of the state, including, among others, that of taxation. After stating that all persons born or naturalized in the United States are subject to the jurisdiction thereof, are citizens of the United States, and of the state in which they reside, it declares

that 'no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person (dropping the designation, *citizen*) of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' The amendment was adopted soon after the close of the civil war, and undoubtedly had its origin in a purpose to secure the newly-made citizens in the full enjoyment of their freedom.   But it is in no respect limited in its operations to them.   It is universal in its application, extending its protective force over all men, of every race and color, within the jurisdiction of the states, throughout the broad domain of the republic.   A constitutional provision is not to be restricted in its application because designed originally to prevent an existing wrong.   Such a restricted interpretation was argued in the *Dartmouth College Case*, 4 Wheat. 518, to prevent the application of the provision prohibiting legislation by states impairing the obligations of contracts to the charter of the college, it being contended that the charter was not such a contract as the prohibition contemplated.   Chief Justice Marshall, however, after observing that it was more than possible that the preservation of rights of that description was not particularly in view of the framers of the constitution when that clause was introduced, said: 'It is not enough to say that this particular case was not in the mind of the convention when the article was framed, nor of the American people when it was adopted.   It is necessary to go further, and to say that, had this particular case been suggested, the language would have been so varied as to exclude it, or it would have been made a special exception.   The case being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction so obviously absurd or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the

constitution in making it an exception.' 4 Wheat. 494.

"All history shows that a particular grievance suffered by an individual or a class, from a defective or an oppressive law, or the absence of any law, touching the matter, is often the occasion and cause for enactments, constitutional or legislative, general in their character, designed to cover cases not merely of the same, but of all cases of a similar nature. The wrongs which were supposed to be inflicted upon or threatened to the enfranchised race, by special legislation directed against them, moved the framers of the amendment to place in the fundamental law of the nation, provisions, not merely for security of those citizens, but to insure to all men, at all times, and at all places, due process of law, and the legal protection of the laws. Oppression of the person and spoliation of property by any state were thus forbidden, and equality before the law was secured to all men. . . . With the adoption of the amendment the power of the states to oppress any one, under any pretense, or in any form, was forever ended, and henceforth all persons within their jurisdiction could claim equal protection under the laws. And by equal protection is meant equal security to any one in his private rights — in his right to life, to liberty, to property, and to the pursuit of happiness. It implies not only that the means which the laws afford for such security shall be equally accessible to him, but that no one shall be subject to any greater burdens or charges than such as are imposed upon all others under like circumstances. This protection attends every one everywhere, whatsoever be his position in society, or his association with others, either for profit, improvement or pleasure. It does not leave him because of any social or official position which he may hold, or because he may belong to a political body, or to a religious society, or be a member of a commercial, manufacturing or transportation company. It is the shield which the arm of

our blessed government holds at all times over every
one, man, woman and child, in all its broad domain,
wherever they may go, and in whatever relations they
may be placed.   No state — such is the sovereign com-
mand of the whole people of the United States — shall
touch the life, the liberty, or the property of any person,
however humble his lot, or exalted his station, without
due process of law; and no state, even with due process
of law, shall deny to any one within its jurisdiction the
equal protection of the laws.

" Unequal taxation, so far as it can be prevented, is,
therefore, with other unequal burdens, prohibited by the
amendment.   .   .   .   The fact to which counsel allude,
that certain property is often exempted from taxation
by the states, does not at all militate against this view of
the operation of the fourteenth amendment in forbidding
the imposition of unequal burdens.   Undoubtedly, since
the adoption of that amendment, the power of exemp-
tion is much more restricted than formerly, — but that it
may be extended to property used for objects of a public
nature is not questioned, — that is, where the property
is used for the promotion of the public well-being, and
not for any private end.   Thus, property used for public
instruction, for schools, colleges, universities, which are
open to all applicants on similar conditions, may properly
be exempted.   The public benefit is the equivalent to the
state for the tax which would otherwise be exacted.   If
buildings used as churches for public worship are also
sometimes exempted, it must be because, apart from
religious considerations, churches are regarded as insti-
tutions established to inculcate principles of sound
morality, leading citizens to a more ready obedience to
the laws.   Whatever the exemption, it can only be sus-
tained for the public service or benefit received.   The
equality of protection which the fourteenth amendment
declares no state shall deny to any one is not thus in-
vaded."

From this able consideration of the object, scope and purpose of the fourteenth amendment, by this able judge, it clearly appears that it was designed as a limitation upon the power of the states; that unequal taxation by the states, so far as it can be prevented, with other unequal burdens, is prohibited; that property may be exempted by the state from taxation without invading the provisions of the amendment, when the public benefit to be derived from such exemptions is equivalent to the tax that would otherwise be exacted; and that such exemption can only be sustained where the property exempted is used for the promotion of the public well-being. And so, if it were true that the plaintiff had been incorporated by the territory of Montana, and the right of way through the public lands exempted from taxation, considering the purpose for which the contract of incorporation was made, and the consideration for such exemption, viz., to promote the public welfare, and to secure the use of the road at all times for public purposes, such exemption from taxation would not have come within the prohibitions of the fourteenth amendment. But even if such exemption from taxation were prohibited to the states and territories, there is nothing in the amendment or in the constitution that limits the power of the federal government in disposing of its own property upon such terms and conditions as it thinks best. On the contrary, the constitution gives the congress full power to dispose of the property of the United States without limitation.

For like reasons, if the limitations of the amendment operated upon the power of congress, still this exemption from taxation would not thereby be forbidden; under the provisions of the act incorporating plaintiff, the government derives a public benefit from the road. It retains the right to use the road for certain public purposes, and makes it a great national highway for the benefit and well-being of all the people. The public benefit to be

derived from the road was thought by congress to be equivalent to the tax which otherwise would have been exacted. Congress had the right to judge of this matter, and to dispose of the property of the government as it thought best for the public gaood. Says Justice Field: " Congress can undoubtedly exempt any agencies it may employ for services to the general government from such taxation as will, in its judgment, impede or promote their performance." Id.

The benefits to accrue to the government by reason of the construction of the Northern Pacific Railroad were deemed by congress sufficient, not only to exempt the right of way from taxation, but to justify a grant of the public lands. The contract — the act incorporating the company — is founded upon a mutual consideration, and cannot be impaired. Certainly, after they have become vested, after the contract has been performed, after the road has been constructed, upon the terms and conditions imposed in the contract of incorporation, and both parties are reaping the benefits of such contract, it is not within the competency of national, state or territorial legislation to nullify or make inoperative any of the terms of such contract. Legislation cannot disturb vested rights. It would be just as rational to hold that the land grant is within the prohibition of the fourteenth amendment as that the exemption from taxation is inhibited thereby; for the act of incorporation grants the odd sections of land for forty miles on either side of the line of the road to the company, without any compensation whatever, other than that to be received by the government from the construction of the road, while for other public lands it charges and receives a compensation for a grant of title.

It is within the constitutional power of congress to exempt property from taxation. *Ill. Cent. R. Co. v. Co. of McLean,* 17 Ill. 291; *Matheny v. Golden,* 5 Ohio St. 361; *State of Ohio v. Com. Bank Cin.* 7 Ohio, 125; *State*

*of New Jersey* v. *Wilson*, 7 Cranch, 164; *Gordon* v. *App.
Tax Ct.* 3 How. 133; *Osborne* v. *Humphrey*, 7 Conn. 335;
*State of New Jersey* v. *Branin*, 3 Zab. 485; *P. & W. R.
R.* v. *Maryland*, 10 How. 393; *Prov. Bank* v. *Billings*, 4
Pet. 514; *State Bank of Ohio* v. *Knoop*, 16 How. 396;
*Osborn* v. *Bank of U. S.* 9 Wheat. 738. A state law
imposing a tax upon property exempt from taxation by
virtue of a valid act of congress is unconstitutional and
void. *Osborn* v. *Bank of U. S. supra.*

Briefly, the situation is this: The United States owns
the public lands, and has the right to dispose of them as
it will. In order to bring about the construction of a
railroad from Lake Superior to Puget Sound, which it
might use for certain public and national purposes; to
strengthen the government and to facilitate its opera-
tions; to promote the happiness and prosperity of the
people; to consolidate the Union; and to invigorate and
strengthen the nation,—it enters into a contract whereby
it agrees to give certain of the public lands, and to ex-
empt the right of way through such lands in the terri-
tories from taxation, in consideration that a road be
constructed upon the terms and conditions named in the
contract. The government had the right to make such a
contract. It had the unlimited right to dispose of its
own property. The provision exempting the right of
way from taxation was no more illegal than was the
grant of lands to the company. Both the exemption and
the grant were for the same purpose, viz., to aid in the
construction of the road. A territorial legislature cannot
defeat this solemn obligation. It cannot repeal an act of
congress. It cannot take upon itself the attributes of
sovereignty, and interfere in the disposal of property that
does not belong to it. Our organic act (section 6) forbids
the territorial legislature from passing any law interfer-
ing with the primary disposal of the soil.

The national government is supreme within the limits
of the constitution. When it speaks, its voice is sover-

eign, in those cases in which the people, "in order to form a more perfect union," and to found a nation, surrendered their sovereignty. Taxation is the exercise of sovereign power. Taxation for national purposes is exercised by national authority; and for state purposes and property, it is exercised by state authority. Each is supreme within its proper jurisdictions. " That the power of taxation is one of vital importance; that it is retained by the states; that it is not abridged by the grant of similar power to the government of the Union; that it is to be concurrently exercised by the two governments,— are truths which have never been denied. But such is the paramount character of the constitution that its capacity to withdraw any subject from the action of even this power is admitted. The states are expressly forbidden to lay any duties on imports or exports, except what may be absolutely necessary for executing their inspection laws. If the obligation of this prohibition must be considered,— if it may restrain a state from the exercise of its taxing power on imports and exports,— the same paramount character would seem to restrain, as it certainly may restrain, a state from such other exercise of this power as is in its nature incompatible with, and repugnant to, the constitutional laws of the Union. A law absolutely repugnant to another as entirely repeals that other as if express terms of repeal were used." Marshall, C. J., in *McCullough* v. *Maryland, supra; Weston* v. *Charleston*, 2 Pet. 466; *Osborn* v. *Bank of U. S. supra.* It follows, therefore, that the exemption of plaintiff's right of way through the public lands in the territories from taxation was the exercise by congress of a constitutional power, and that the levy and assessment of a tax upon "twenty miles of railroad," in Custer county, by the authorities thereof, by virtue of a territorial law, was without authority and is void; and this leads us to the next inquiry, viz.:

5. Has a court of equity jurisdiction to enjoin the col-

lection of a tax that has been assessed and levied upon property exempt from taxation, or, in other words, in what cases, and under what circumstances, will the collection of taxes be enjoined? The collection of taxes is necessary to carry on the operations of government, and therefore the right to levy and assess taxes for that purpose is elemental and sovereign. No government can exist without this right, and writs of injunction or other obstructions to the collection of taxes are always refused by the courts, except in certain defined cases. Says Benning, J., in *Eve* v. *State*, 21 Ga. 50: "How can a government calculate with any certainty upon the revenues if the collection of taxes was subject to be arrested in every instance in which a tax-payer or tax collector could make out a *prima facie* — a technical — case for arresting such collection? Far better is it to let an individual pay the government what it demands of him, at the time of the demand, as he will be certain of getting it back with interest, after more or less delay, if it was not due."

Therefore, it is the settled doctrine of the law, that, in order to entitle a person to equitable relief against an illegal tax, he must, by his bill, bring his case under some acknowledged head of equity jurisdiction. There must be allegations which show his remedy at law is inadequate. It is not sufficient that he makes it appear that the tax is illegal merely. He must go further and allege special circumstances bringing his case under some recognized head of equity jurisdiction, such as that the enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, or cast a cloud upon the title of his real estate. Says Judge Cooley: "To entitle a party to relief in equity against an illegal tax, he must, by his bill, bring the case under some acknowledged head of equity jurisdiction. The illegality of the tax alone, or the threat to sell property for its satisfaction, cannot of themselves furnish any ground for equitable relief. In ordinary cases a party must find his

remedy in the courts of law, and it is not supposed he will fail to find one adequate to his proper relief. Cases of fraud, accident or mistake, cases of cloud upon the title to one's property, and cases where one is threatened with irremediable mischief, may demand other remedies than those the common law can give, and these, in proper cases, may be afforded in courts of equity." Cooley, Taxation, 536.

Says Mr. Justice Field, in *Dows* v. *City of Chicago,* 11 Wall. 109: "Assuming the tax to be illegal and void, we do not think any ground is presented by the bill justifying the interference of a court of equity to enjoin its collection. The illegality of the tax and the threatened sale of the shares for its payment constitute, of themselves alone, no ground for such interposition. There must be some special circumstances attending a threatened injury of this kind distinguishing it from a common trespass, and bringing the case under some recognized head of equity jurisdiction, before the preventive remedy of injunction can be invoked. It is upon taxation that the several states chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. . . . No court of equity will, therefore, allow its injunction to issue to restrain their action except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no remedy by the ordinary processes of the law. It must appear that the enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, or, where the property is real estate, throw a cloud upon the title of the complainant, before the aid of a court of equity can be invoked."

Says Mr. Justice Hunt, in *Haunewinkle* v. *Georgetown,* 15 Wall. 548: "It has been the settled law of this country for a great many years, that an injunction bill

to restrain the collection of a tax, on the sole ground of the illegality of the tax, cannot be maintained. There must be an allegation of fraud; that it creates a cloud upon the title; that there is apprehension of a multiplicity of suits, or some cause for presenting a case of equity jurisdiction. This was decided as early as the days of Chancellor Kent, in *Mooers* v. *Smedley,* 6 Johns. Ch. 28, and has been so held from that time onward."

The complaint herein alleges, as the special circumstances whereby the equitable interposition of the court is invoked, that Custer county is insolvent; that if the plaintiff should pay the tax and recover judgment therefor against the county it would be paid in county warrants, worth but eighty cents on the dollar, and, therefore, that the remedy at law is inadequate; that the assessment, valuation and return of the assessor was made upon a blank form, which, when returned by the assessor, showed an assessment of $200,000, made by him on "twenty miles of railroad and rolling stock;" that the blank so certified and returned to the board of county commissioners has been lost, and the evidence, whether the sum so assessed is on real or personal estate, right of way or rolling stock of plaintiff, does not appear on the books of the county treasurer; nor since the loss of the assessment blank so filled out by the assessor, does it appear on any record or any archives of the county; and the proof thereof, which must be produced from other sources, is liable to be lost, and the plaintiff, by reason of the death of witnesses, may be unable hereafter to prove the assessment upon its right of way which it is now able to do; that notwithstanding the illegality of the valuation, assessment, and levy of taxes thereon, the defendant has a record thereof, and threatens to proceed, and is proceeding, to collect said tax, and the same stands on the books of the defendant, the treasurer of said county, and in his hands is a lien on the real estate of the plaintiff in said county, and is a cloud upon plaintiff's title thereto, and that, un-

less enjoined, the defendant will levy upon and sell the personal and real property of the plaintiff for the tax so assessed and returned. The plaintiff abiding its complaint, after demurrer sustained, the allegations thereof are taken as true, and so it must be taken as a fact that the assessment and the assessor's return, showing the property assessed, is lost, but the valuation and levy was transferred in the aggregate to the books of the treasurer and a record made showing the amount of the tax to be paid, which tax is a lien upon the plaintiff's real estate; and that this valuation and tax was assessed and levied upon the plaintiff's right of way, which fact the plaintiff is now ready to make appear, but the evidence thereof may be lost. The record of the valuation and tax on the treasurer's books is therefore perfect, and the lien created thereby complete. There is nothing appearing of record to show that such valuation and assessment was made upon property not subject to taxation, or that the same was not assessed in the manner provided by law. Our statute (sec. 1001, R. S. p. 616) provides as follows: "Every tax levied under the provisions of this chapter is hereby made a lien against any and all the property assessed, and such lien shall attach at the time of such assessment, and shall not be satisfied or removed until such taxes are paid."

A lien upon real estate appearing of record, with nothing of record to show but the same may be enforced, and, requiring evidence *aliunde* to defeat it, is a cloud on the title of such real estate. The defendant, unless enjoined, will enforce this lien, sell the real estate, and deliver to the purchaser a deed for the property so sold. Our statute further provides (sec. 205, p. 442, R. S.): "Every conveyance or other instrument conveying or affecting real estate, which shall be acknowledged or proved and certified as hereinafter prescribed, may, together with the certificate of acknowledgment or proof, be read in evidence without further proof."

This statute seems to do away with the common law doctrine that the recitals in a tax deed are not evidence against the owner of the property, but must be proved by evidence *aliunde*, and to make the tax deed *prima facie* evidence of title. If the statute has this effect, then a party claiming under a tax deed only need to introduce the deed in evidence to make out his case. The production of the deed would be *prima facie* proof that the property described in it was subject to taxation, and that the valuation, assessment and levy was made in pursuance of the statute. That the assessment and levy was not made according to law, or that the property was exempt from taxation, would have to be proved by the adverse party, in order to defeat the claimant's tax title. Such a deed, then, would be a cloud upon the title, and a court of equity in a proper case would interpose by injunction to prevent such a cloud being cast.

Says Sawyer, J., in *Huntington* v. *C. P. R. R. Co.* 2 Sawy. 514: "The court will enjoin the casting of a cloud upon the title in cases wherein the cloud, when cast, would be removed."

In the case of *Banking Co.* v. *Mayor of Jersey City*, 2 Beas. 228, the chancellor says: "But again, the court has jurisdiction for the purpose of preventing the delivery of deeds which will be clouds upon the complainant's title. These deeds will not be void upon their faces. The land is *prima facie* liable to taxation. The record is perfect. The defendants can make the necessary proof to enable them to recover the land. The defense against the validity of the deeds depends upon matters outside the record. The complainants ought not to have their title put in jeopardy by meeting the issue just when the defendants choose."

In *Van Doren* v. *Mayor of New York*, 9 Paige, 389, Chancellor Kent said: "Where the claim of the adverse party to the land is valid upon the face of the instrument or proceedings sought to be set aside, as where the de-

fendant has procured and put upon record a deed obtained from the complainant by fraud or upon a usurious consideration which requires the establishment of extrinsic facts to show the supposed conveyance to be inoperative and void, a court of equity may interfere and set it aside as a cloud upon the real title of the land."

If the tax deed is presumptive evidence of a good title in the purchaser, and may be introduced in evidence without first establishing the regularity and legality of the proceedings up to the time of the execution of the deed, then such deed creates a cloud upon the title which a court of equity may interfere to set aside; or in a case where the record is perfect and complete, showing neither the illegality of the tax or irregularity in the assessment, valuation or levy of the same, equity will interpose and enjoin the execution of the deed, where the bill of proper averments shows the tax or the proceedings to be void. Judge Cooley clearly states the law, referring to numerous decisions, as follows: "If the alleged tax has no semblance of legality,— if, upon the face of the proceedings, it is wholly unwarranted by law, or for any reason totally void, so that any person inspecting the record and comparing it with the law is at once apprised of the illegality,— the tax, it would seem, could neither constitute an incumbrance nor an apparent defect of title, and therefore, in law, could constitute no cloud. If this be so, the jurisdiction which is exercised by courts of equity to relieve parties by removing clouds upon their titles, could not attach in such cases. When, however, the illegality or fatal defect does not appear on the face of the record, but must be shown by evidence *aliunde,* so that the record would make out a *prima facie* right in one who should become purchaser, and the evidence to rebut this case may possibly be lost, or be unavailable from death of witnesses, or other causes, or when the deed, given on a sale of the lands for the tax, would, by statute, be presumptive evidence of a good title in the pur-

chaser, so that the purchaser might rely upon that for a recovery of the lands until the irregularities were shown, the courts of equity regard the case as coming within their ordinary jurisdiction, and have extended relief on the ground that a cloud on the title existed or was imminent." Cooley, Taxation, 542, 543.

The allegations of the complaint show that the assessment upon which the tax herein was levied is lost, and that there is nothing of record by which it appears that said tax was assessed and levied upon plaintiff's right of way through the public lands. Therefore there is nothing of record showing that the tax is illegal and void; and, by comparing the record with the law, the illegality of the tax does not appear. Such illegality, by the averments of the complaint, must be shown by evidence *aliunde*, which the plaintiff is now ready to make appear, but the evidence thereof is liable to be lost. The books of the treasurer show the valuation and the tax. This record, in his hands, is complete. The illegality of the tax does not therein appear, so that the tax thereby evidenced is, by the statute of the territory, a lien upon plaintiff's real estate, and the record would make a *prima facie* right in one who should become a purchaser thereof for said tax.

The averment of the complaint that the plaintiff is now able to show that the tax was levied upon property exempt from taxation; that the assessment was not made in the manner provided by law; and that the evidence whereby this may be shown is, by the death of witnesses, liable to be lost,— are sufficient to bring the case within the acknowledged jurisdiction of a court of equity. Cooley, Taxation, 543.

The averment that Custer county is unable to pay its debts, except in warrants worth eighty cents on the dollar, conclusively shows that plaintiff's remedy at law is inadequate. If the plaintiff should pay the tax and recover a judgment for the amount of the same against

the county, such judgment would be paid in warrants drawn upon the county, which are worth but eighty cents on the dollar, thereby causing a loss to the plaintiff of twenty cents on each dollar of the amount paid as taxes. A court of equity will interfere when, by reason of the insolvency of the defendant, an irreparable injury is threatened to the plaintiff. Equity will interfere to enjoin the collection of a tax levied upon property exempt from taxation. See *Board of Com'rs* v. *Templeton*, 51 Ind. 266; *Com'rs* v. *Markle*, 46 Ind. 96; *Lafayette* v. *Cox*, 5 Ind. 38; *Koffman* v. *Keightley*, 24 Ind. 509; *Nave* v. *King*, 27 Ind. 356, 475; *Harney* v. *Indianapolis R. R.* 32 Ind. 244; *Merrill* v. *Plainfield*, 45 N. H. 126; *Webster* v. *Town of Harwinton*, 32 Conn. 131; *Ferrett* v. *Town of Sharon*, 34 Conn. 105; *Prettyman* v. *Sup'rs*, 19 Ill. 406; *Clark* v. *Sup'rs*, 27 Ill. 305; *Taylor* v. *Thompson*, 42 Ill. 9; *Cleghorn* v. *Postlewaite*, 43 Ill. 428; *Veiley* v. *Thompson*, 44 Ill. 9; *Allison* v. *Louisville R. R. Co.* 9 Bush, 247; *Hooper* v. *Ely*, 46 Mo. 505; *Newmeyer* v. *M. & M. R. R. Co.* 52 Mo. 91; *Williams* v. *Peinney*, 25 Iowa, 436; *Hanson* v. *Vernon*, 27 Iowa, 28; *Zorger* v. *Tp. of Rapids*, 36 Iowa, 175. The authority of the supreme court of the United States in *Osborn* v. *Bank of U. S., supra*, seems to be conclusive upon that question for this court. In that case the officers of the state of Ohio, under a law of that state, levied a tax upon a branch bank of the United States at Chillicothe. It was held that the property was exempt from taxation, and its collection enjoined.

A franchise is property. It is the office of an injunction to protect property from destruction. The right to construct a railroad through public lands, and the exemption of its right of way from taxation in the territories, is a franchise. It is a right based upon and growing out of a contract. It is property, and valuable property; but it is such property that taxation might destroy. The right of way through this territory is about

eight hundred miles in length.   If this property is ex-
empt from taxation, an annual tax thereon at the rates
claimed in the complaint might cripple, if it did not de-
stroy, the franchise.   The plaintiff, in the construction
of its road, had the right to rely upon the terms of its
contract with the government.   The imposition of a tax
upon its right of way is an invasion of its contract, and
such a violation thereof as the constitution prohibits,
and as equity will enjoin.

Says Chief Justice Marshall, in *Osborn* v. *U. S. Bank*,
*supra:* "The appellants admit that injunctions are often
awarded for the protection of parties in the enjoyment
of a franchise; but deny that one has ever been granted
in such a case as this.   But although the precise case
may never have occurred, if the same principle applies,
the same remedy ought to be afforded.   The interference
of the court in this class of cases has most frequently
been to restrain a person from violating an exclusive
privilege by participating in it.   But if, instead of a con-
tinued participation in the privilege, the attempt be to
disable the party from using it, is not the reason for the
interference of the court rather strengthened than weak-
ened?   Had the privilege of the bank been exclusive, the
argument admits that any other person or company
might have been enjoined, according to the regular
course of the court of chancery, from using or exercising
the same business.   Why would such person or company
have been enjoined?   To prevent a permanent injury
from being done to the party entitled to the franchise or
privilege; which injury appellants say cannot be esti-
mated in damages.   It requires no argument to prove
that the injury is greater if the whole privilege be de-
stroyed than if it be divided; and so far as respects the
estimate of damages, although precise accuracy may not
be attained, yet a reasonable calculation may be made of
the amount of the injury, so as to satisfy the court and
jury.   It will not be pretended, in such a case, an action

of law could not be maintained, or that the materials do not exist on which a verdict might be found and a judgment rendered. But in this and many other cases of continuing injuries, as in the case of repeated ejectments, a court of chancery will interfere. The injury done by denying to the bank the exercise of its franchise in the state of Ohio is as difficult to calculate as the injury done by participating in an exclusive privilege. The single act of levying the tax, in the first instance, is the cause of the action at law, but that affords a remedy only for the single act, and is not equal to the remedy in chancery, which prevents its repetition and protects the privilege." See *M. & B. Co.* v. *Jersey City,* 1 Beasl. 227; *P. & H. R. R. Co.* v. *Jersey City,* 1 Stockt. Ch. 434.

And so if the property is exempt from taxation, and an action at law would, in a single instance, afford relief against a tax unlawfully levied thereon, yet the relief is inadequate and is not equal to the remedy in equity, which interferes to prevent future taxes and a multiplicity of suits, and protects the franchise from invasion and destruction.

From this consideration of the case our conclusions are as follows:

1. An action or controversy which turns upon the existence, effect and operation of an act of congress is an action arising under such act, and a suit brought to determine such controversy is properly commenced in the district court of the territory, sitting to hear and determine causes arising under the constitution and laws of the United States; and especially is this the case when the action is brought by or against a corporation chartered by an act of congress.

2. Plaintiff's right of way through the public lands is an easement therein, and such an interest in the land that personal articles attached to the soil and annexed to the easement, within the boundaries of the right of way, become a part of the land, and therefore partake of and

are included in the exemption from taxation that belongs to the right of way, and hence that a tax levied upon "twenty miles of railroad" constructed upon, over or through plaintiff's right of way in the territories of the United States, is a tax levied upon property that is exempt from taxation, and therefore void.

3. That the act of congress incorporating plaintiff is a contract between the government and the incorporators and their successors, and it is not within the constitutional power of congress, or of a territorial legislature, to impair the obligations of this contract, which would be done by the imposition of a tax upon plaintiff's right of way, by the authority of congress or the territorial legislature.

4. That the fourteenth amendment to the constitution of the United States is a limitation upon the sovereignty of the states, and was adopted by the people of the United States to secure to the inhabitants of each state equal laws and equal protection of the laws, without regard to race, color or previous condition.

5. That this limitation applies to the subject of taxation, and forbids the states or territories from exempting property from taxation, except in those cases wherein the property is devoted to public uses in which all the people are equally benefited.

6. That it is within the constitutional power of congress to exempt the property of the United States from taxation. The government may dispose of its own property upon such terms and conditions as it deems proper, and congress is the sole judge as to how this property shall be disposed of.

7. It was competent for congress to charter the Northern Pacific Railroad Company; to grant to it public lands; and exempt its right of way through such lands from taxation.

8. There is a consideration for the contract contained in the charter incorporating the Northern Pacific Rail-

road Company, which consideration is found in the public benefits to be derived to the whole people of the United States by reason of the construction of such road.

9. When rights have become vested under a valid contract, legislative authority cannot invalidate such contract or disturb such rights.

10. The fourteenth amendment to the constitution is not a limitation upon the power of congress in the disposal of the property of the United States.

11. In order that a county assessor may have jurisdiction to assess property for taxation he must follow the statute.

12. An assessment made in a manner not authorized by statute, and not in substantial compliance with its provisions, is void and equivalent to no assessment at all.

13. An assessment that values real and personal property in a mass is void.

14. An assessment should show a proper description of the property, and the real estate and personal property should be separately and distinctly assessed and valued.

15. An assessment that is in such a condition that it cannot be equalized by the board of commissioners, sitting as a board of equalization, is void.

16. In assessing railroads for taxation the assessor must follow the provisions of the statute.

17. A tax will not be restrained upon the ground that it is irregular or erroneous.

18. To entitle a party to relief in equity, against an illegal tax, he must bring his case under some acknowledged head of equity jurisdiction.

19. Courts of equity will enjoin the casting of a cloud upon a title, in cases wherein the cloud itself, when cast, would be removed.

20. If the record showing the valuation and levy of a tax is complete on its face, such record creates a lien upon the real estate against which the tax is assessed, and is a cloud upon the title of the owner.

21. If a tax deed is made *prima facie* evidence of the purchaser's title, and may be introduced in evidence, without showing the regularity of the proceedings up to the delivery of the deed, such deed is a cloud upon the title of the owner, and equity would interfere, when, by the averments of the bill, it appears that the property is exempt from taxation, or that the assessment was void.

22. If the illegality of the tax appears upon the face of the proceedings, no cloud is cast upon the title.

23. Equity will enjoin the collection of a tax levied upon property that is exempt from taxation, to prevent a multiplicity of suits and to afford a complete remedy.

24. Equity will interpose to prevent the destruction of a franchise.

25. A franchise is property, and in the case of a continuing injury to the same, courts of equity will prevent a repetition of the injury and protect the franchise.

26. Any encroachment upon the quiet enjoyment of an easement, whether created by grant or prescription, will be prevented by injunction. *Webber* v. *Gage*, 39 N. H. 182; *Seymour* v. *McDonald*, 4 Sandf. Ch. 502; *Holmes* v. *Shreve*, 3 Green Ch. 116; *Hills* v. *Miller*, 3 Paige, 254; *Trustees, etc.* v. *Cowen*, 4 Paige, 510.

27. Equity will interfere to protect rights, when it sufficiently appears that the evidence by which such rights can be established is liable to be lost.

The demurrer to the complaint ought to have been overruled, and the judgment is, therefore, reversed, with costs, and the cause remanded for a new trial.

*Judgment reversed.*